Good morning, my name is William Genago and I represent the appellant in this action, Aaron McKnight. The question in this case is whether a statement made by a defendant in a proper session pursuant to a direct use of immunity agreement with one jurisdiction can then be handed off by that jurisdiction to another one and be used directly against the defendant. Did the plain terms of the agreement prohibit what happened? The literal terms of the agreement did not prohibit what happened. I admit that. How do you get to the point where you've got an enforceable bargain to prevent the government from giving this information to the French? The legal proposition, Judge Hawkins, is that there can be a benefit contained in an agreement that can be undermined by one of the parties. And if that occurs, then it's a breach of the good faith covenant. And that gets to the question, what is the benefit here? The government used the benefit as it won't be used in the case in which we're prosecuting you or any other case by this office. He got that benefit. Well, first of all, that wasn't even the agreement. The agreement wasn't that it won't be used in a prosecution. It was that it won't be used in the actual trial, right? In this trial in which he was then charged or any other prosecution brought by this office. So not that it wouldn't be used to an investigation or anything else. Absolutely not. It was a derivative. They could do that. They were free to do all of that. Now, do we know whether the French actually used the document in the French prosecution? We know they had it and used it for something. But do we know that they used it in the prosecution? My understanding is that the French magistrate cited his admissions and his statements as one of the basis for finding him guilty in abstention. And, of course, in the extradition proceeding, the magistrate judge listed that as the first piece of evidence in establishing probable cause. So we know that it was used there. It really comes down to a question of what was the benefit here. I mean, I guess the way that I think about this is if I bring a client into a proper session and the government says to me, okay, this is the agreement, just page 83 of the excerpt of record. It says, we're not going to use these statements that you're going to make at this session in any case directly against you brought by this office. They're not saying they're not going to, that some other office is bound by that. In fact, they're saying we can't control any other office. I mean, it's another jurisdiction. We can't do any, I get that. And that's a risk I have to take. What I don't think that I have to risk is that after that meeting, they walk out and they hand it to the State of California. And they say, prosecute him. And to me, if that was the benefit to Mr. McKnight, even though I wasn't representing him at the time, but the benefit to someone in that situation is that you are not basically making a confession because. Is it inconceivable, or say it the other way, isn't it conceivable in a typical plea bargain situation that there might be the conduct that the feds are looking into might be of interest to State or local prosecution officials? Absolutely. And my argument is not that they can't prosecute him with another jurisdiction, not that they can't use these statements to get evidence and turn that evidence over. It really has to do with just the statements made at that session. Because he walks in there and he waives his Fifth Amendment privilege. Do we know whether in the negotiations the defense in this case asked for a broader interpretation of use? We don't know that. And I submitted a declaration from the lawyer who represented him. I'm just authenticating the agreement. My understanding is that it's an objective determination, and what Mr. McKnight's subjective belief about this would not have been legally relevant determining what the parameters of the prohibition against the use are. But, I mean. Well, did the plain terms prohibit giving it over to State authorities? No, they did not. And isn't that sort of a problem? Because that went – maybe that nobody anticipated France, although given the nature of the conspiracy, I don't think it's a big reach. But it may well be that nobody sitting in the room anticipated that and didn't provide for it. But the State authority seems to be pretty straightforward. And if the plain terms of the agreement don't even say that you don't turn it over to other U.S. authorities, how can we infer that the intent of the agreement was really to preclude anybody else from being given this material? That seems to be kind of a stretch from what the terms say. The only response I have to that, Judge Clifton, is that, from my perspective as representing someone in that situation, there would be no reason to do that. I mean, what benefit am I getting? Okay, he's not going to be prosecuted by the Feds. The State's going to prosecute him. There's no protection for him. But the protection would come in saying that the U.S. Attorney's Office would not turn it over. It's true. They can't bind the State of California or the Republic of France from not prosecuting. But presumably, and they've indeed made the argument here, they could bind themselves from not turning it over, which is what you allege the agreement's supposed to have said, but the agreement didn't say that. And I agree with that. I mean, if that's what the answer is here, then the court should just say that, because then everybody will know that that's what it has to be in the agreement. Honestly, I've tried to negotiate that term in every agreement that I've come up with since that time, and in three different U.S. Attorney's Offices, and all of them have said to me, you've got to trust me. And that sort of gets back to my whole point about this. It's something that's understood. If the court says it's got to be negotiated, I'm fine with that. They will have a decision and know that you've got to negotiate that, and it will become another point to include in the letter. So that is a perfectly reasonable result. I'm not saying it's not, but I think that when you walk your client in there, you think there's good faith agreement that they're just not going to hand it off. It might get used against them in some other way, and it might come out in some other way. They could turn over everything else they have. What I don't think that the parties expect is going to happen is they're going to take those statements and disseminate to someone else. But what is your legal theory? My legal theory is breach of good faith and fair dealing, essentially. That's correct. That's correct. Basically that there are some things that are so implicit in the nature of the benefit that you're bargaining for that if the other side – the other side is supposed to respect that sort of underlying benefit. And even if it's not prohibited by the literal terms of the agreement, you can still do something that undermines it. So that's the legal proposition. But it has to undermine what the actual agreement is. The actual agreement here has nothing to do with a prosecution by France. That's your problem. That's the issue. In other words, since they've agreed not to introduce this in a – I suppose – I can't think of the hypothetical, but if they did something that enabled the introduction of it in a case in the United States, in their case, but in some fashion, then that would be a problem. But there's nothing this agreement deals with a prosecution in France at all. I understand that. I mean, it really has to get – I think I'm just repeating myself now and I'll sit down. But basically it has to do with the prohibition against direct use. And the way that I see direct use at that point is not direct use by the U.S. Attorney's Office, although they can only bind themselves. I get that. And so that's why I don't think they could – it couldn't go beyond that office. What about – I mean, to me, a slightly more advantageous way of framing this is to – is with regard to the extradition proceedings. In other words, they're not binding France, but they're binding themselves. And who is it who introduced it in the extradition proceedings? The government. And I made that argument below, and it did not succeed. And I did not raise it in the appeal because I thought this was a better argument, but maybe not. But – but – You've got some time for rebuttal. I do. Thank you.  Thanks for coming in today. I appreciate it. May it please the Court, my name is Daniel Goodman. I represent the – the Respondent, Adam Torres, seated with me at council table as Assistant United States Attorney, Michael Lowe. I hope later in my remarks to regale the Court with my scholarly analysis of the Covenant of Good Faith and Fair Dealing, but I wanted to start with a moment of much more stripped down question, which is, did what happened – or is what happened in this case fair? And – That's not the question, is it? Well, I think it has some traction at the due process level. I – I think the answer to that is emphatically yes for many of the same reasons that the Covenant of Good Faith and Fair Dealing are inapplicable. And those reasons, just to highlight them, are number one, there was nothing in the agreement, as has been established, that prohibited the government from doing exactly what it did. Number two, there's no evidence in the record, nobody's found any evidence that there was a course of dealing between prosecutors and defense attorneys in the Central District of California at this time that they would – I believe Mr. Ginego used the word – trust each other and that this information would not be turned over. There's no evidence that that's the case. And Mr. Ginego's recent episodic three instances really isn't a substitute for evidence in the record. Have you ever watched the Irving Younger evidence tapes? I believe I have. They're sitting on my desk. I hope – or on my table. I hope to see them. He has this wonderful phrase about something not necessarily being wrong, but being greasy kids' stuff. Isn't that what this is? And that goes – no, I don't think it's greasy kids' stuff. And that goes to why I started with fair. Do we know whether this prosecutor intended to do this all along? I think the answer to – we don't know to a certainty. But number one, it wasn't the prosecutor who turned over the information. Well, that doesn't answer the fairness question. I mean, you come in and posit, let's start with fairness. And I understand on one level why you'd do it, but it seems to me it's also the problem here. Because you have to ask yourself, why would he give this information over if it was intended that it would be turned over to some other prosecuting authority and used against him? It really cannot be that the defendant anticipated what would play out. So you're already – if that's the case, you're already starting with some problem. And Judge Hawkins poses the question, did the prosecutor anticipate what played out? I don't know. We don't have that in the record. Mr. Lowe, who's at counsel table, was one of the prosecutors. He wasn't on the case at the time of the proffering. He came on later. I brought him in case he might be able to answer any questions. The – again, it's not in the record, but it appears, based on my inquiry, that the evidence or the proffer report was turned over by one of the case agents to French authorities. Well, they're an agent of the government. They are an agent of the government, absolutely, Your Honor. And I agree that there is something – something unseemly about what happened. But I think the question is, is it illegal? And the answer to that is definitely that it is not illegal. And Judge Listerick, in his certification of extraditability, makes that finding and makes it in a number of different ways. For example, he says it would be unreasonable for a defense attorney in this situation not to think that this might happen, or words to that effect. It's also a little impractical, isn't it? To do what, Your Honor? To do this. To turn over? You know, when I prosecuted, our rule was today's defendant is tomorrow's witness. Why would you do this to somebody? Well, the reason it happened, it wasn't – I hesitate at the characterization to do this to someone. There was some sharing going on between the customs agent and the French officials. Even as the bargain was being made? I don't know the timing. That's not on the record. It was eight, nine years ago. But there was a considerable amount of evidence sharing early on. Do you think that makes things better or worse? It's a fact. And I'm only mentioning it for that reason. I think it makes things better. I think it points to the fact that the agreement doesn't cover this situation and that, therefore, in the future, defense attorneys and government counsel need to be aware of this possibility. But I think it shows that there was no intent. Let me – I floated this other notion before. Why that is that handing it over to the French government might not be a breach of the good faith and fair deal. You haven't gotten to your explication of that. But what about using it in the extradition proceedings? It seems to me that it's fair to read this at least as saying that you're not going – That was an argument that was raised by the defense. It was raised to Judge Wisterik, the magistrate judge. It was raised to Judge Snider, the district judge. And it was rejected. And he just admitted that he didn't use it, that he didn't raise it here. And I understand all that. But I still don't understand why it isn't a much more direct breach of the understanding that went on here. In other words, if all that had happened here is that the French had used it and we wouldn't be here and nobody would be complaining all that hard, there wouldn't even be a forum for complaining. But the problem here is that it was then actually used in an American proceeding in this district by this U.S. attorney. And even though there had been a general promise that this U.S. attorney was not going to use this document to prosecute this man. Because I didn't brief that, because it wasn't raised, I can only refer the Court to the excellent opinions of Judge Wisterik and Judge Snider, which take on that argument. We reverse excellent opinions all the time. And our excellent opinions get reversed by the high court all the time. And I understand it's not there. And you're perfectly in your rights to therefore not answer it. But it does seem to me to give, you know, an additional aura of extreme unfairness here, which is not simply that it was handed over, but that it was then used by the same government entity that had promised not to use it. The short answer to both that question and Judge Hawkins' question, I think, is that it is not a prosecution brought by the United States. And the reason, the rationale in both of the opinions that I mentioned, is because an extradition is not a prosecution. And both opinions cited substantial case law saying that. But they can get a pretty fine cut. Yes, true, but in a most technical sense. But if you wanted to be a little more creative about reading a contract, you could say not quite. Anyway, do you want to give your exposition about fair dealing? What would be a violation of the breach of good faith and fair dealing of a closely analogous kind? I only found two areas in the law where there were breaches of covenant of good faith and fair dealing found. One is where one party prevented the performance of another party of its side of the contract. That's sometimes called a performance prevention doctrine. That didn't go on here. The second category is where one party has very broad discretion how to execute a contract. And that is held to be bound by the covenant of good faith and fair dealing. And a paradigm example of that is in the Karma Developers case, which is cited in briefs of both parties, where a lease agreement provided that the leasee could not sublet the property without permission from the leasor. And because there were no limits on the leasor's or lessor's exercise of that discretion written in the contract, it was held to be limited by the covenant of good faith and fair dealing. And there are cases like that in the insurance context mainly. Secondarily, I think in the employment context. All of this is in your brief, isn't it? I think this is substantially covered in my brief. I was responding to you. But if, for example, the prosecution somehow facilitated the introduction of this document in a prosecution in the district, even if it didn't introduce it itself, would that be an example? If the prosecution... If your office facilitated, I'm not quite sure how this hypothetical hangs together, but somehow facilitated the introduction of this document, say, by a witness in a prosecution, although it didn't itself precipitate it, I guess it would still be introduced. I can't quite come up with that. I thank the Court for saying that. I'm having a hard time coming up with the exact factual scenario. But in this scenario, we just don't think it's a breach. And that's what the courts below thought as well. I see that my red light is on. It's red. Thank you. Thank you, Your Honor. Mr. Rebuttal. I don't have a case that illustrates the point, but I did try to give a hypothetical in my reply brief which has to do with trade secret information. If there's two companies and they have a trade secret agreement that certain information is not going to be shared because it would be harmful to their joint endeavor, if that company then hands it off to another company and that company then uses it, I mean, I think that would be... Well, but see, the problem here is that the agreement is not a use agreement. If it were a use agreement, you'd be right. But it isn't a use agreement. It's an agreement only not to use it in a prosecution by this office. So therefore, the fact that it's just such a narrow agreement that it's hard to see how it could be breached by something like that. I understand that, the narrow way. It is a direct use agreement, but it's limited to this office, and I understand that. And the way that I view that is that's by necessity... But it's not even limited to this office. It's limited to this office's introduction of it in the case in sheet. That's what I... Yeah. That's what's meant by direct. I mean, that's how I understand that is what the term direct use is, because they could use it in their rebuttal case. They can use it for derivative use. So that's what I mean by direct use. The only point that I would make is that I think that what should have happened here is that when you induce someone to waive their Fifth Amendment privilege and come in and incriminate themselves and say, if you don't answer truthfully, you can be subject to prosecution for obstruction of justice and perjury and false statements, that when you get that memo and you record it and you write it down, when you then send your investigative package to France or to the state or wherever you're going to do it, you need to pull those pages out. Okay. Thank you. The case just argued will be submitted for decision, and we'll proceed to the last case on the argument calendar, which is Tano v. Dow Chemical.
judges: Hawkins, Berzon, Clifton